CARLOS MAX AND ENCARNACION MAX, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Max v. Commissioner
Docket No. 19994-81.
United States Tax Court
T.C. Memo 1984-464; 1984 Tax Ct. Memo LEXIS 208; 48 T.C.M. (CCH) 984; T.C.M. (RIA) 84464; August 30, 1984. *208 Held, petitioners failed to report as income certain deposits made to their savings account and to their Canadian account in 1974, 1975, and 1976. Held further, petitioners failed to report as income interest earned on funds held in their Canadian account in 1974, 1975, 1976, and 1977. Held further, the resultant underpayments of tax in 1974, 1975, 1976, and 1977 were due to fraud and, accordingly, petitioners are liable for additions to tax under sec. 6653(b), I.R.C. 154, for each of the years in issue. Held further, petitioners' claimed deductions for automobile expenses and telephone expenses for 1974, 1975, and 1976 are disallowed in part. Jerome S. Richman,Edward P. Guttenmacher,Michael S. Cease, Sidney A Soltz, and Neal E. Farr, for the petitioners. Judy K. Hunt, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: In his notice of deficiency dated May 28, 1981, respondent determined the following deficiencies in and additional to petitioners' Federal income taxes: Addition to tax pursuant
Year
Deficiency
to sec. 6653(b)
1974
$21,235.96
$10,617.98
1975
7,277.31
3,638.66
1976
66,793.18
33,396.59
1977
7,067.50
3,533.75
The issues presented for our decision *209 are: (1) whether for the years 1974, 1975, and 1976 petitioners failed to report income from petitioner Dr. Carlos Max's medical practice in the respective amounts of $29,500, $5,480, and $123,591.61, and whether for the years 1974, 1975, 1976, and 1977 petitioners failed to report interest income in the respective amounts of $9,477.48, $5,680.89, $5,240.76, and $12,931.65; (2) whether, if we find that petitioners received unreported income, any part of the resultant underpayment of taxes for 1974, 1975, 1976, or 1977 was due to fraud; and (3) whether petitioners' deductions for automobile expenses and telephone expenses for the years 1974, 1975, and 1976 should be disallowed, in part, as determined by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. At the time they filed their petition herein, Dr. Carlos Max and Encarnacion Max, husband and wife, resided at 3081 S.W. 4th Street, Miami, Florida. For the years 1974, 1975, 1976, and 1977 petitioners filed joint Federal income tax returns with the Internal Revenue Service Center in Detroit, *210 Michigan. Petitioners were married in Madrid, Spain in 1959. Dr. Max immigrated to the United States from Spain in 1961 and was naturalized in Detroit, Michigan in 1970. Mrs. Max immigrated to the United States from Spain in 1962 and was naturalized in Detroit, Michigan in 1973. Dr. Max was licensed to practice medicine in Michigan in 1970. He acquired a license to practice medicine in Florida in 1976. During the years 1974 through 1977, Dr. Max operated a private medical practice in Detroit, specializing in obstetrics and gynecology. As a part of his practice, he performed abortions on a regular basis. Dr. Max maintained a checking account (hereinafter referred to as the business checking account) during the years 1974 through 1977 at Michigan National Bank, Detroit, Michigan, account number 111-2568-9, in which he or his wife deposited business receipts from Dr. Max's medical practice. Mrs. Max handled the financial aspects of her husband's practice when she was in the United States. However, Mrs. Max traveled to Spain each year to stay with her children while they attended school there. While Mrs. Max was in Spain, Dr. Max handled the financial aspects of his medical practice. *211 Deposits to the business checking account were handled personally at all times by either Dr. or Mrs. Max. Petitioners deposited into their business checking account during the years 1974, 1975, and 1976 the following amounts: Total
1974
Deposits
Jan.
$ 12,202.96
Feb.
11,418.20
Mar.
14,941.63
Apr.
14,780.72
May
8,820.31
June
10,940.40
July
12,300.00
Aug.
5,430.96
Sept.
11,694.69
Oct.
13,897.60
Nov.
10,209.72
Dec.
100.00
$126,737.19
Total
1975
Deposits
Jan.
$ 18,204.30
Feb.
4,367.25
Mar.
8,920.50
Apr.
13,895.78
May
7,033.00
June
9,411.47
July
15,311.50
Aug.
8,493.00
Sept.
10,693.10
Oct.
12,874.20
Nov.
10,583.75
Dec.
15,245.67
$135,033.52
Total
1976
Deposits
Jan.
$ 10,782.21
Feb.
15,200.74
Mar.
15,638.94
Apr.
12,927.88
May
15,170.59
June
13,306.40
July
7,100.07
Aug.
5,123.74
Sept.
7,537.66
Oct.
16,588.43
Nov.
7,708.10
Dec.
15,181.63
$142,266.39
Deposit slips for the business checking account show the following deposits into the account during 1974, 1975, and 1976: 1974
1/05/74
$3,413.25
6/24/74
2,748.50
1/15/74
958.00
6/28/74
566.50
1/22/74
7,713.96
7/08/74
8,707.00
1/22/74
117.75
7/16/74
666.90
2/01/74
1,654.70
7/24/74
497.00
2/04/74
1,085.30
7/25/74
1,083.67
2/10/74
1,924.50
7/31/74
1,345.50
2/11/74
364.00
8/08/74
2,115.00
2/12/74
243.00
8/12/74
1,087.25
2/19/74
205.50
8/19/74
445.00
2/21/74
5,915.20
8/27/74
1,783.71
3/01/74
7,730.88
9/04/74
2,150.24
3/12/74
3,820.75
9/13/74
1,895.40
3/21/74
3,390.00
9/19/74
7,649.05
4/01/74
3,352.75
9/30/74
1,152.00
4/10/74
4,335.72
10/07/74
147.50
4/26/74
7,092.25
10/14/74
3,318.50
5/02/74
1,795.00
10/21/74
604.00
5/16/74
4,758.25
10/25/74
4,349.00
5/21/74
2,267.06
12/28/74
4,326.50
5/31/74
610.00
11/04/74
2,757.52
6/01/74
2,287.00
11/11/74
966.00
6/06/74
223.50
11/12/74
2,271.95
6/12/74
769.00
11/19/74
886.00
6/14/74
3,304.75
11/29/74
3,328.25
6/20/74
431.15
12/11/74
100.00
1975
1/02/75
$9,928.80
4/14/75
1,155.00
1/11/75
3,985.00
4/17/75
2,635.55
1/18/75
1,624.00
4/30/75
1,918.50
1/26/75
2,866.40
5/08/75
1,375.50
2/05/75
1,616.75
5/20/75
5,657.50
2/11/75
845.00
6/03/75
1,789.50
2/19/75
3,223.00
6/14/75
4,401.97
2/25/75
2,702.50
6/24/75
3,320.00
3/04/75
3,516.25
7/01/75
1,593.50
3/10/75
849.50
7/02/75
262.50
3/15/75
2,376.25
7/16/75
2,175.00
3/20/75
2,178.50
7/19/75
8,745.50
4/01/75
3,398.98
7/28/75
2,535.00
4/02/75
1,588.25
8/05/75
5,999.50
4/11/75
3,199.50
8/13/75
396.00
8/27/75
2,107.50
11/13/75
3,404.00
9/06/75
5,698.00
11/24/75
5,412.50
9/15/75
3,541.00
11/29/75
1,462.00
9/17/75
142.00
12/05/75
3,576.67
9/25/75
1,321.10
12/08/75
992.00
10/07/75
4,598.50
12/15/75
1,160.00
10/14/75
2,155.70
12/19/75
2,248.00
10/21/75
3,108.50
12/27/75
1,269.00
11/01/75
3,011.50
12/31/75
522.00
11/06/75
305.25
1976
5/19/76
212.00
1/03/76
2,151.00
5/21/76
1,044.50
1/10/76
2,033.50
5/29/76
7,589.65
1/16/76
2,439.06
6/05/76
1,259.59
1/22/76
1,165.75
6/08/76
5,520.50
1/23/76
1,493.50
6/17/76
359.50
1/29/76
371.40
6/18/76
2,891.28
1/31/76
606.00
6/21/76
2,004.00
2/06/76
1,269.75
6/23/76
846.00
2/09/76
686.00
6/26/76
423.53
2/11/76
55.00
7/05/76
3,678.40
2/16/76
2,579.99
7/10/76
2,425.17
2/17/76
255.00
7/16/76
190.00
2/18/76
2,613.00
7/17/76
708.50
2/23/76
1,027.00
7/24/76
98.00
2/24/76
705.00
8/03/76
1,214.80
2/25/76
1,536.49
8/04/76
418.00
3/01/76
85.00
8/06/76
555.96
3/02/76
543.37
8/13/76
1,788.32
3/06/76
3,624.79
8/14/76
190.78
3/13/76
723.50
8/21/76
329.00
3/13/76
90.28
8/27/76
99.00
3/15/76
2,892.73
8/31/76
527.88
3/22/76
816.00
9/03/76
1,708.30
3/27/76
2,349.00
9/03/76
1,127.04
3/28/76
2,967.70
9/04/76
30.00
4/10/76
3,281.52
9/07/76
32.00
4/14/76
2,644.71
9/10/76
764.00
4/16/76
838.00
9/17/76
3,524.61
4/26/76
4,332.34
9/22/76
100.00
4/30/76
1,831.31
9/26/76
241.71
5/03/76
664.00
5/10/76
4,940.14
5/12/76
720.00
10/02/76
4,623.27
11/17/76
2,452.20
10/06/76
1,998.40
11/19/76
1,682.50
10/09/76
1,053.25
12/01/76
1,874.52
10/17/76
3,367.22
12/06/76
2,699.28
10/25/76
3,174.51
12/13/76
771.50
10/30/76
2,081.18
12/20/76
3,264.57
11/01/76
1,358.22
12/23/76
4,516.34
11/06/76
1,879.78
12/30/76
[1] 2,055.42
11/13/76
235.40
*212 With one exception, the deposit slips consistently list deposits as having been made in the form of checks. The one exception is a deposit on October 6, 1976 in the amount of what appears to be $1,752.80, listed as having been made in the form of "Coin," immediately above "Checks." Petitioners were advised by their accountant, who prepared petitioners' tax returns for the years in question, that all business receipts, both in the form of cash and in the form of checks, should be deposited into their business checking account. Petitioners' gross income from Dr. Max's medical practice was computed and reported on their Federal income tax returns for the years 1974, 1975, and 1976 by totaling the deposits made to their business *213 checking account, and petitioners were made aware of this fact. Those patients of Dr. Max who did not pay be some form of insurance, paid by check or cash. It is clear from an examination of the deposit slips for the business checking account that little, if any, of the cash receipts were deposited into that account. Petitioners never advised their accountant of any income from Dr. Max's business over and above the deposits to the business checking account. During the years 1974 through 1977, petitioners maintained a personal joint bank checking account at Michigan National Bank, Detroit, Michigan, account number 0112-5668-2. Deposit slips show deposits made to this account on the following dates and in the following amounts: 1974
Amount
Feb. 4
$900.00
Mar. 21
900.00
Apr. 15
900.00
May 21
900.00
June 18
500.00
June 22
15,000.00
Oct. 30
1,000.00
Oct. 30
100.00
Nov. 22
400.00
Dec. 4
870.00
1975
Amount
Jan. 10
$1,300.00
Feb. 3
1,450.00
Mar. 3
1,500.00
Apr. 2
1,100.00
May 8
1,000.00
May 29
250.00
June 3
1,200.00
July 7
1,200.00
Oct. 7
800.00
Nov. 3
1,000.00
Nov. 29
1,000.00
1976
Amount
Apr. 1
$1,000.00
July 9
1,000.00
Dec. 30
2,425.00 During the years 1974 through 1977, petitioners also maintained a joint savings account at the Michigan *214 National Bank, Detroit, Michigan, account number 32-000236-3 (hereinafter referred to as the savings account). Deposits to the savings account were made by both petitioners. Some of the deposits to the savings account were made in the form of cash. A summary of deposits to and withdrawals from the savings account for the years 1974 through 1976 is set forth below. The amounts labeled "Deposit-Cash" have been treated by respondent as unreported income from Dr. Max's medical practice. Date
Deposit-Cash
Total Deposit
Withdrawals
2/01/74
$ 3,000.00
2/04/74
$ 2,000.00
2,000.00
2/07/74
4,000.00
4,000.00
2/09/74
1,500.00
1,500.00
2/19/74
3,500.00
4/22/74
$10,000.00
4/30/74
10,000.00
6/06/74
10,000.00
10,000.00
7/24/74
2,000.00
3,431.73
8/29/74
7,000.00
9/13/74
20,000.00
10/24/74
4,000.00
10/28/74
1,400.00
Total
$19,500.00
$49,831.73
$30,000.00
4/11/75
$ 8,288.01
5/14/75
$ 2,100.00
2,100.00
7/28/75
13,961.50
9/17/75
3,348.00
9/26/75
2,000.00
12,000.00
10/01/75
1,000.00
10/08/75
$18,000.00
11/28/75
1,380.00
12,080.00
Total
$ 5,480.00
$52,777.51
$18,000.00
1/09/76
$ 3,360.00
2/03/76
$ 3,000.00
2/06/76
3,131.61
$ 5,400.00
2/09/76
500.00
500.00
2/19/76
1,800.00
5,000.00
5/04/76
40,000.00
7/30/76
1,000.00
9/17/76
2,328.00
10/29/76
30,545.23
11/03/76
10,000.00
10,000.00
11/22/76
3,000.00
4,087.37
11/26/76
1,800.00
2,800.00
Total
$23,591.61
[2] $60,660.60
$44,000.00
*215 Petitioners did not disclose to their accountant the source of the cash deposits into the savings account in any of the years in question. They did disclose the interest earned on the savings account, and their accountant included that interest on their returns. On July 25, 1973 petitioners opened in their own names a United States Term Deposit Receipt account at the Bank of Montreal, 200 Ouellette Avenue, P.O. Box 248, Windsor, Ontario, Canada (hereinafter referred to as the Canadian account). From 1973 through 1976 the following amounts were deposited into the Canadian account: Date
Amount
July 25, 1973
$25,000
($24,000 check; $1,000 cash)
August 15, 1973
10,000
(cash)
August 15, 1973
25,000
April 19, 1974
10,000
April 22, 1974
20,000
July 14, 1976
100,000
(cash)
Deposits into the Canadian account were made by each of the petitioners and contracts of deposit with the Bank of Montreal were signed by each. Of the $25,000 deposit listed above for August 15, 1973, $24,000 was made by means of a money order drawn on Michigan Bank made payable to and endorsed by Carlos Max, M.D., and Encarnacion *216 Max. The $20,000 deposit listed above for April 22, 1974 apparently was made by means of a bank money order drawn on Michigan Bank. The bank money order apparently consisted of $10,000 withdrawn from petitioners' savings account and $10,000 withdrawn from their business checking account on the same date. The deposit for $10,000 on April 19, 1974 and the deposit of $100,000 on July 14, 1976 were not transferred to the Canadian account from petitioners' other accounts. From 1974 through 1977 the following amounts were paid as interest earned on the Canadian account by the Bank of Montreal: Year
Amount
1974
$9,477.58
1975
5,680.89
1976
5,240.76
1977
12,931.65
In each of the years 1974, 1975, 1976 and 1977 the Bank of Montreal sent forms NR4 to petitioners' home address, reflecting the amounts of earned interest. Petitioners did not reveal to their accountant the existence of the Canadian account, and the interest earned on the Canadian account was not reported on petitioners' 1974, 1975, 1976, or 1977 Federal income tax returns. The Canadian account was closed on August 3, 1977, and the funds therein were withdrawn in the form of three bank drafts on the Bank of Montreal, New York Agency, in *217 United States funds made payable to Dr. Carlos Max and/or Encarnacion Max. These drafts were as follows: Date
Check No.
Amount
Aug. 8, 1977
454586
$100,000.00
Aug. 8, 1977
454587
61,788.64
Aug. 8, 1977
454588
61,788.65
The above drafts were endorsed by Encarnaction Max and were cashed at the Bank Espanol DeCredito, Madrid, Spain. In May 1977 respondent, in response to information received relating to the Canadian account, began an audit of petitioners' 1974, 1975, and 1976 tax returns under the direction of tax auditor William R. Rapach. When Mrs. Max initially was interviewed by Rapach, she denied any knowledge of the Canadian account. However, on a second interview with Rapach, Mrs. Max delivered Forms NR4, which she had located in her home, reflecting interest earned on the Canadian account. During this second interview, Mrs. Max, although she continued to deny knowledge of the account, exhibited a certain degree of knowledge of Canadian interest rates during the years of question. Following his interviews with Mrs. Max, Rapach referred petitioners' case to the Intelligence Division of the Internal Revenue Service. Special agent Gerald Van Vliet was assigned to investigate petitioners' *218 tax liabilities for the years 1974 through 1977. In the course of that investigation, Van Vliet made a thorough examination of the deposits into petitioners' various bank accounts. He secured copies of monthly statements and deposit tickets for petitioners' business checking account by issuing summonses to the Michigan National Bank. In addition, he examined the bank's microfilm copies of deposit transactions. He learned that Michigan National Bank's practice was to record deposit transactions by first filming the deposit ticket and then filming all the items, except cash, that comprised the deposits reflected on the deposit ticket. If a deposit ticket reflected a cash deposit, the bank would film a cash memo prepared by a teller. The cash memo would be filmed along with the checks that made up the deposit ticket. Although Van Vliet was unable to read all the items on the microfilm and apparently was unable to procure microfilm copies of some of the items deposited, he concluded that none of the deposit tickets were accompanied by cash memos. Van Vliet also secured bank records for petitioners' other accounts. He analyzed all of the deposits and withdrawals from the various *219 accounts in an attempt to trace transfers from the business checking account to another account and to net out any such transfers. Summarized below are the dates, amounts, payees, and check numbers of checks written to cash, to Encarnacion Max, or to Carlos Max on the business checking account for the years 1974 through 1976. Also included is a list of those items which were transferred to other of petitioners' accounts. 1974
Check
Transfer
Date
Amount
Payee
No.
To
1/05/74
$600.00
Cash
1438
3/21/74
900.00
Cash
1539
0112-5668-2
4/22/74
10,000.00
Cash
1575
Canadian Acct.
4/26/74
10,000.00
Cash
1586
32-000236-3
4/30/74
200.00
Cash
1594
10/01/74
146.99
Cash
1782
1/20/74
4,000.00
Carlos Max, MD
1789
32-000236-3
10/26/74
1,400.00
Cash
1804
32-000236-3
10/28/74
1,000.00
Cash
1809
0112-5668-2
11/? /74
4,000.00
Cash
1830
0112-5668-2
12/? /74
25.00
Cash
1873
1975
1/20/75
120.00
Encarnacion
1902
1/20/75
1,400.00
Cash
1867
0112-5668-2
1/22/75
56.26
Cash
1914
1/26/75
120.00
Encarnaction
1933
2/02/75
1,500.00
Cash
1934
0112-5668-2
2/? /75
120.00
Encarnacion
1948
2/? /75
120.00
Encarnacion
1968
2/26/75
50.00
Cash
1974
3/? /75
120.00
Encarnacion
2002
3/03/75
1,500.00
Cash
2005
0112-5668.2
3/10/75
120.00
Encarnacion
2011
3/17/75
120.00
Encarnacion
2022
3/24/75
120.00
Encarnacion
1978
3/31/75
311.95
Cash
1984
3/31/75
100.13
Cash
1988
4/01/75
1,200.00
Cash
1989
4/01/75
120.00
Encarnacion
1991
4/01/75
120.00
Encarnacion
1992
4/10/75
9,528.01
Carlos Max, MD
1999
4/14/75
120.00
Encarnacion
2034
4/21/75
180.00
Encarnacion
2034
4/22/75
150.00
Encarnacion
2053
4/25/75
120.00
Encarnacion
2055
5/01/75
1,000.00
Cash
2064
0112-5668-2
5/12/75
120.00
Encarnacion
2069
5/? /75
120.00
Encarnacion
2095
5/22/75
20.00
Encarnacion
2098
5/25/75
60.00
Encarnacion
2084
6/02/75
120.00
Encarnacion
2092
6/04/75
1,200.00
Cash
2093
6/09/75
120.00
Encarnacion
2106
7/07/75
1,200.00
Cash
2147
0112-5668-2
7/07/75
120.00
Encarnacion
2150
7/14/75
120.00
Encarnacion
2154
9/26/75
10,000.00
Cash
2228
32-000236-3
11/03/75
1,000.00
Encarnacion
2283
0112-5668-2
11/27/75
1,000.00
Encarnacion
2330
32-000236-3
11/28/75
9,700.00
Carlos Max, MD
2332
32-000236-3
1976
2/02/76
3,000.00
Cash-Insurance
2406
2/06/76
200.00
Encarnacion
2414
32-000236-3
4/01/76
1,000.00
Cash
2481
0112-5668-2
8/14/76
1,000.00
Cash
2679
12/01/76
1,000.00
Cash
2829
[3]
*220 In the course of his investigation, Van Vliet conducted an interview with Dr. Max, during which he questioned Dr. Max about the Canadian account. Dr. Max explained that the money in the Canadian account was not his, but actually belonged to a friend from Spain, who had entrusted it to Dr. Max for safekeeping. Dr. Max further explained that various mutual friends of his and the person who actually owned the money in the Canadian account brought the money over to him from Spain. Dr. Max refused to reveal to Van Vliet the name of the individual to whom the Canadian funds allegedly belonged, as well as the names of the couriers who allegedly brought the funds to him from Spain. He indicated to Van Vliet that his reason for opening the account outside of the United States was to avoid confusion by the taxing authorities with respect to the identity of the ownership of the funds. Van Vliet also conducted interviews with employees at Dr. Max's place of business. He concluded, based on these interviews, that Dr. Max *221 required cash payments for all abortions performed on an out-patient basis and that he had received substantial cash receipts during the years in question for the performance of those abortions. As a result of his overall examination, Van Vliet concluded that petitioners had received substantial cash receipts from Dr. Max's medical practice during 1974, 1975, and 1976; that petitioners had not deposited those cash receipts in the business checking account; that petitioners had not included the cash receipts in their gross incomes during 1974, 1975, and 1976; and that petitioners had made substantial unexplained cash deposits during those years to their savings account and to the Canadian account. Van Vliet was unable to find any nontaxable sources for the cash deposits, and he, therefore, concluded that these deposits represented the cash receipts from Dr. Max's medical practice. In 1979, Dr. Max moved to 3081 S.W. 4th Street, Miami, Florida, property which petitioners had purchased in December 1976. Petitioners also owned a condominium located at 600 Biltmore Way, Coral Gables, Florida, which they had purchased in June 1978. On February 22, 1980 respondent referred petitioners' *222 case to the Department of Justice, recommending that Dr. and Mrs. Max each be prosecuted under section 7206(1) for the years 1974, 1975, and 1976 and that Dr. Max be so prosecuted for the year 1977. [4] In January 1981 a Federal grand jury began an investigation of petitioners relating to their tax returns filed for 1974 through 1977 and the failure of those returns to show the interest income earned on the Canadian account. Throughout 1981 and continuing to the present, Encarnacion Max has been residing in Madrid, Spain. On January 19, 1981 a letter was forwarded to petitioners from the office of the United States Attorney, Eastern District of Michigan, advising them of the grand jury investigation and of the Government's intention to seek an indictment of petitioners. On February 10, 1981 a letter was forwarded to petitioners by their then attorney, Erwin A. Rubenstein, *223 advising them as follows: I am satisfied that following my conversation with Mr. Papelian that if nothing further is added, the government will seek an indictment of both you and Mrs. Max. If so indicted here in Detroit, you will be required to travel to Detroit and appear at an arraignment. * * * On or about March 11, 1981 Dr. Max reserved a roundtrip ticket on Iberia Airlines to Madrid, Spain, scheduled to depart Miami on April 2, with return flight scheduled for May 31. On March 13, 1981 petitioners' attorney forwarded to Dr. Max a letter, advising him that the criminal case was scheduled to be presented to the grand jury on April 5, 1981. He further advised-- Assuming an indictment is returned, then it will be necessary for both you and Mrs. Max to appear at an arraignment in Detroit on or before April 14, 1981. If you do not do so voluntarily, then a warrant will be issued for your arrest. A nominal bond has been agreed to. However, the government will request that both you and your wife be required to surrender your passports. On March 20, 1981 petitioners' attorney forwarded to Dr. Max another letter advising him that-- [t]he government will be issuing subpoenas for handwriting *224 exemplars or samples from both you and Mrs. Max. Subpoenas in this regard will be served within the next week. A subpoena commanding Dr. Max to appear and testify before a grand jury in the United States District Court for the Eastern District of Michigan on April 6, 1981 was issued on March 18, 1981. Theresa White House Girard, a special agent in Miami, received a referral from Van Vliet to serve the subpoena. On April 2, 1981, Girard contacted Dr. Max by telephone and scheduled a meeting for 3:00 that afternoon. When Dr. Max failed to meet Girard at the specified time, Girard went to Dr. Max's mother's house. Girard noticed that Dr. Max's mother's furniture had been moved out to the front porch of the house and that there was furniture stacked in the living room. Dr. Max's mother told Girard that Dr. Max had had to leave the state on an emergency. Girard then asked whether the furniture was Dr. Max's and Dr. Max's mother responded that it was. Also on April 2, 1981 Dr. Max's real estate broker, Robert Dunn, contacted an attorney, Jorge Sanchez Galarraga, and advised the latter than he had found a purchaser for Dr. Max's condominium. Dunn asked Galarraga to prepare, without *225 delay, a deed, a bill of sale, a no-lien affidavit, and a power of attorney on behalf of Dr. Max. Dr. Max picked up the documents later in the same day while en route to the airport. Meanwhile, Van Vliet, having learned of Girard's failure to make contact with Dr. Max, began to check the airlines. He eventually was able to ascertain that Dr. Max had made a reservation on flight 963 of Iberia Airlines. Van Vliet then notified agents to prepare for an arrest at the airport. When Van Vliet again contacted the airline and was told that Dr. Max had purchased the ticket and was waiting to board, he requested that the airline hold the plane until the agents arrived. At approximately 5:05 p.m. April 2, 1981, Dr. Max was asked to deplane and was arrested by the special agents. At the time of Dr. Max's arrest, the agents seized his luggage, which consisted of a carry-on bag, three large suitcases, and a cardboard box, which was approximately 7 feet long. Among the items found in the luggage were deeds, bank passbooks, withdrawal slips, letters relating to the grand jury investigation, an international driver's license, medical supplies, keys, rings, watches, coins and $44,200 in American *226 currency. On April 8, 1981, Dr. and Mrs. Max were each indicted on four counts of willfully making and subscribing a false return under section 7206(1). Counts 1 through 4 were for the years 1974, 1975, 1976, and 1977, respectively, and related to the unreported interest income earned on the Canadian account. On May 27, 1981 Dr. Max pleaded guilty to Count 4 of the indictment pursuant to a Rule 11 Plea Agreement. [5] *227 On August 4, 1981 the United States District Court for the Eastern District of Michigan entered its judgment and probation order sentencing Dr. Max to 7-1/2 months imprisonment with all but the first 60 days suspended, followed by 2 years probation, and imposed a $5,000 fine. Mrs. Max remains under indictment in this matter and is a fugitive from justice, residing in Madrid, Spain. On their joint returns for 1974, 1975, and 1976, petitioners reported no income other than business income from Dr. Max's medical practice and interest income received from the Michigan National Bank. On their joint return for 1977, petitioners reported no income other than $3,750 of wages received by Mrs. Max, business income from Dr. Max's medical practice, and interest income received from the Michigan National Bank and the Florida National Bank. In his notice of deficiency, dated May 28, 1981, respondent determined that certain business receipts from Dr. Max's medical practice were deposited into petitioners' accounts at the Michigan National Bank and the Bank of Montreal, which receipts were not reported in petitioners' 1974, 1975, and 1976 returns. Specifically, respondent increased petitioners' *228 taxable income by $29,500 for 1974, $5,480 for 1975 and $123,591.61 for 1976, which figures were derived from the following deposits: Deposits to:
1974
1975
1976
Michigan National Bank
$19,500.00
$5,480.00
$ 23,591.61
Bank of Montreal
10,000.00
100,000.00
Total
$29,500.00
$5,480.00
$123,591.61
Respondent also determined that petitioners received interest income in 1974, 1975, 1976, and 1977 in the respective amounts of $9,477.48, $5,680.89, $5,240.76 and $12,931.65 from the Bank of Montreal, which income petitioners failed to report. Accordingly, respondent increased petitioners' taxable income for each of the years in question by the amount of the alleged unreported interest income. Respondent further determined that petitioners' claimed deductions of $1,957, $2,676, and $1,800 for automobile expenses for the taxable years 1974, 1975, and 1976, respectively, should be reduced by $1,432 for 1974, $2,151 for 1975, and $1,275 for 1976 and increased petitioners' taxable income accordingly. The basis for these adjustments was that petitioners failed to establish that more than $525 was an ordinary and necessary business expense in each of those years. The allowed deduction of $525 per year was based *229 upon 500 trips to the hospital per year at 7 miles per trip, with an allowance of $ .15 per mile. The parties have stipulated that in the years 1974, 1975, and 1976, petitioners estimated amounts of business travel.In addition, respondent determined that petitioners' claimed deductions of $1,950, $1,787, and $2,267 for telephone expenses for the taxable years 1974, 1975, and 1976, respectively, should be reduced by $156 for 1974, $184 for 1975, and $291 for 1976 and increased petitioners' income accordingly.The basis for these adjustments was that petitioners failed to establish that the excess expenses were ordinary and necessary business expenses or were expended for the purpose designated. Finally, respondent determined that all or part of the underpayment of tax required to be shown on petitioners' returns for 1974, 1975, 1976, and 1977 was due to fraud and accordingly imposed an addition to tax under section 6653(b), I.R.C. 1954, for each of those years. OPINION Issue I. Unreported Income
Respondent contends that petitioners had substantial unreported income in the years 1974, 1975, 1976, and 1977. His calculations of the amount of that unreported income were derived from three *230 sources: (1) certain cash deposits to petitioners' personal savings account; (2) certain deposits to petitioners' Canadian account at the Bank of Montreal; and (3) interest earned on the funds deposited in the Canadian account. Dr. Max contends that all of the money He received from his medical practice was deposited into his business checking account at the Michigan National Bank, and that to the best of his knowledge, all of his business receipts were reported on his income tax returns.Furthermore, he contends that all the deposits to his savings account came from his business checking account and that the money deposited in the Canadian account belonged to one Secundine Rodrigues. [6] *231 At the outset it must be noted that petitioners' gross income from Dr. Max's medical practice was computed and reported on their Federal income tax returns for 1974, 1975, and 1976 by totaling deposits made to petitioners' business checking account.As respondent correctly points out, this fact has two implications. First, any amounts transferred from the business checking account to other accounts were reported as income. Second, amounts deposited in other accounts directly were never reported on petitioners' returns as income from Dr. Max's medical practice. Respondent employed a midified bank deposits method to ascertain petitioners' alleged unreported income in 1974, 1975, and 1976. Certain deposits of cash made directly to the savings account and certain deposits made directly to the Canadian account were treated as unreported income earned by petitioners in the year of deposit. Such deposits did not include any amounts that respondent determined represented transfers from the business checking account to either the savings account or the Canadian account. Since the cash *232 deposits in question did not represent transfers from petitioners' business checking account and since petitioners reported no income in 1974, 1975, and 1976 other than business income, computed by totaling deposits to the business checking account, and interest income earned on the savings account, respondent determined that the cash deposits to the savings account and the Canadian account represented unreported income. Respondent was unable to determine any nontaxable sources for these deposits, and Dr. Max has not asserted that there were any such nontaxable sources. [7] *233 Respondent contends that the source of the alleged unreported income was cash payments received by Dr. Max for the performance of abortions on a regular basis. We have examined the copies of bank records stipulated into evidence, analyzing them in conjunction with summaries of these transactions, which were also stipulated into evidence. It is clear from those records that little, if any, cash was deposited into petitioners' business checking account during 1974, 1975, and 1976. Respondent was able to secure copies of deposit slips, reflecting almost every deposit made into that account during the 3-year period. Every deposit is reflected as having been made in the form of checks, with the exception of one item in the amount of $1,752.80 (deposited on October 6, 1976) listed as "Coin." Furthermore, we are satisfied, after analyzing the bank records in conjunction with the stipulation of facts, that respondent correctly eliminated from his calculations any transfers from petitioners' business checking account to either the savings account or the Canadian account. Finally, after analyzing all of the bank records in conjunction with the stipulation of facts, we can only conclude, as has respondent, that petitioners made substantial unexplained cash deposits to the savings account in 1974, *234 1975, and 1976 and to the Canadian account in 1974 and 1976. Dr. Max has not asserted any nontaxable sources for the unexplained cash deposits. His primary contention is that all of his business receipts were deposited into his business checking account, the amount of deposits to which was reported as his business income on his tax returns for the years in question. He also contends that he was not the owner of the funds deposited into the Canadian account. We cannot accept Dr. Max's contention that all of his business receipts were deposited into his business checking account during the years in question. As stated previously, the bank records stipulated into evidence indicate that deposits to the business checking account consisted almost exclusively of checks. Yet, Dr. Max has not contended that he never received cash payments for the performance of medical services. To the contrary, special agent Van Vliet, whom we found to be a credible witness, testified that Dr. Max admitted during audit that he did receive some cash payments in the course of his business, and Dr. Max, himself, testified that he was sometimes paid with cash. Furthermore, we found Dr. Max's overall testimony, *235 including his testimony with respect to his general payment policies and the handling of the financial aspects of his business, so evasive and unresponsive as to be of little assistance to him. For example, when questioned about his payment policy for the performance of abortions, Dr. Max testified as follows (questions by respondent, answers by Dr. Max): Q Dr. Max, isn't it also true that you would charge for an abortion in your office during this period of time, $150? A We would charge that with Medicaid, Blue Cross, and a part of the insurance. Q Dr. Max, you state that you would charge this under your insurance guidelines. Isn't it true that when you performed abortions you required to be paid in cash? A Not necessarily so. Q Did you require that some of your patients on whom you performed abortions pay you in cash? A I would say 90 percent, 95 percent of the patients admitted have some kind of insurance, either Medicare, Blue Cross or product insurance. Q I don't believe that was responsive to the question, Dr. Max. In terms of the abortions that you performed on your patients during these years, did you not on most occasions require that they pay you in cash? A No, I didn't *236 handle that part of the business. I didn't know. I don't remember. On a number of occasions, Dr. Max testified that Mrs. Max, who of course was not present to testify, handled all the financial aspects of his medical practice. However, this testimony was contradicted by his concession at trial that Mrs. Max spent a substantial portion of each of the years in question in Spain, during which time, according to Dr. Max, he himself personally handled the financial aspects of the business. Dr. Max's testimony clearly and convincingly suggests to us that both he and his wife had full knowledge of the financial aspects of his medical practice, including the knowledge that cash receipts were not routinely deposited in the business checking account. Dr Max has offered no explanation of the source of the amounts deposited in the savings account, except for the broad, and otherwise unsupported, allegation that all business income was deposited into the business checking account. He has asserted no nontaxable sources for these deposits. We can only conclude, as has respondent, that the likely source of these cash deposits was cash receipts from Dr. Max's medical practice. Dr. Max has attempted *237 to explain the source of the amounts deposited into the Canadian account by asserting that the funds belonged to another individual, identified for the first time at trial as one Secundine Rodrigues. He claimed at trial that these funds were brought over to him from Spain by couriers, including one Bella Armaea. Dr. Max could not advise the Court of the address of either Rodrigues or Armaea. We believe that Dr. Max's testimony in the foregoing regard is not worthy of belief when considered in light of the other evidence in the record and the clear attempts by both Dr. and Mrs. Max to obfuscate the truth about the Canadian account. Dr. Max testified that the couriers brought the funds to him in the form of American currency and that only these funds, and none of his own, were deposited in the Canadian account. Such testimony is clearly contradicted by the documents stipulated into evidence. These documents indicate that $24,000 deposited in the Canadian account in August 1973 was deposited by means of a money order drawn on the Michigan Bank made payable to and endorse by Carlos Max, M.D., and Encarnacion Max. They further indicate that on April 22, 1974 petitioners withdrew $10,000 *238 from their personal savings account and $10,000 from their business checking account and on the same day deposited $20,000 into the Canadian account by means of a money order drawn on Michigan Bank made payable to Encarnacion Max. Mrs. Max indicated during the initial audit stage of this case that she had no knowledge of the Canadian account. Dr. Max testified that Mrs. Max never made any deposits to the Canadian account and in fact was not aware of the account "until the last minute." Again, the documents stipulated into evidence clearly contradict Dr. Max's testimony in this regard, as well as Mrs. Max's denial during audit.Contracts of deposit with the Bank of Montreal reflecting deposits to the Canadian account at various times during the years in question were signed by both Dr. and Mrs. Max. In addition, some of the copies of deposit slips, reflecting deposits to the Canadian account, indicate that the funds in question were deposited by "Encarnacion Max," or "Mrs. E. Max." Furthermore, the August 1973 bank money order used to transfer funds to the Canadian account was endorsed by both Dr. and Mrs. Max. Finally, correspondence from the Bank of Montreal was addressed jointly *239 to Dr. and Mrs. Max and such correspondence, as well as the Forms NR4, were sent to Dr. and Mrs. Max's home address. In short, Dr. Max has presented no evidence at all to support his broad contention that the funds held in the Canadian account actually belonged to someone other than himself. On the other hand, respondent has produced documentary evidence, which when considered in conjunction with Dr. Max's evasive and contradictory testimony, clearly demonstrates that the funds held in the Canadian account belonged to petitioners. Respondent determined that a $10,000 deposit to the Canadian account on April 19, 1974 represented additional unreported business income received by petitioners in 1974. He further determined that a $100,000 cash deposit to the Canadian account on July 14, 1976 represented additional unreported business income received by petitioners in 1976. Neither of these deposits were made as a result of transfers from petitioners' business checking account. Since we have concluded that the funds deposited in the Canadian account belonged to petitioners and since Dr. Max has presented no evidence of a nontaxable source of income, we can only conclude, as has respondent, *240 that the $10,000 and $100,000 deposits in question represented additional unreported income from Dr. Max's medical practice during the years deposited. With respect to the unreported interest income earned on the Canadian account, Dr. Max's sole contention is that the interest was income to the the true owner of the funds, who was someone other than himself. Since we have concluded that petitioners were the owners in fact, as well as in name, of the funds held in the Canadian account, we must further conclude that the interest earned on those funds was income to petitioners. [8]
In conclusion, we sustain respondent's determination that petitioners failed to report business income for the years 1974, 1975, and 1976 *241 in the amounts of $29,500, $5,480, and $123,591.61, respectively. We also sustain respondent's determination that petitioners failed to report interest income for the years 1974, 1975, 1976, and 1977 in the amounts of $9,477.48, $5,680.89, $5,240.76, and $12,931.65, respectively. Fraud
Respondent has determined that all or part of the underpayment of tax by petitioners in the years 1974, 1975, 1976, and 1977 was due to fraud and, hence, seeks to impose an addition to tax for fraud under section 6653(b) for each of those years. Fraud, for purposes of section 6653(b), has been defined as an intentional wrongdoing with the specific intent to evade a tax believed to be due and owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958). Respondent has the burden of proving, by clear and convincing evidence, that some part of the underpayment was due to fraud. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), *242 affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed; rather, it must be established by affirmative evidence. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence, because direct proof of the taxpayer's intent is rarely available. Spies v. United States,317 U.S. 492 (1943). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Respondent need not prove the precise amount of underpayment resulting from fraud, but only that there is some underpayment and that some part of it is attributable to fraud. Lee v. United States,466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court; Webb v. Commissioner,394 F.2d 366, 378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Kreps v. Commissioner,351 F.2d 1, 6 (2d Cir. 1965), affg. 42 T.C. 660 (1964). In our judgment the evidence in this case establishes in a clear and convincing manner that at least a part of the tax underpayments *243 for 1974, 1975, 1976, and 1977 was the result of fraud with the intent to evade taxes on the part of both petitioners. In fact, we have found no difficulty in reaching this conclusion. A consistent failure to report substantial amounts of income over a number of years is, by itself, strong evidence of fraudulent intent. Webb v. Commissioner,supra at 379; Gromacki v. Commissioner,361 F.2d 727, 732 (7th Cir. 1966), affg. a Memorandum Opinion of this Court; Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court; Schwarzkopf v. Commissioner,246 F.2d 731, 734 (3d Cir. 1957), affg. in part a Memorandum Opinion of this Court. In the instant case we have found that petitioners understated their taxable income (without regard to the alleged overstatement of automobile and telephone expenses) by $38,977.48 in 1974, $11,160.89 in 1975, § 128,832.37 in 1976, and $12,931.65 in 1977. Although petitioners did not prepare their own returns for these years, they were fully aware that their accountant computed their business income on the basis only of the total deposits made to their business checking account. Notwithstanding this knowledge, petitioners *244 deposited little, if any, of the cash receipts from Dr. Max's medical practice in the business checking account and failed to disclose this fact to their accountant. Moreover, petitioners never disclosed to their accountant the existence of the Canadian account, nor, of course, did they turn over to him the Forms NR4 sent to them by the Bank of Montreal. Such intentional withholding of data from petitioners' accountant in such a manner as to conceal taxable income constitutes conduct evidencing an intent to file false and fraudulent returns. Farber v. Commissioner,43 T.C. 407, 420 (1965); Draper v. Commissioner,32 T.C. 545, 562 (1959). In each of the years 1974, 1975, and 1976, petitioners made substantial cash deposits to accounts other than their business checking account. Respondent, in his investigation, eliminated from his calculations of underreported income all deposits that he determined represented transfers from petitioners' business checking account. Petitioners have offered no persuasive explanation of the source of the funds deposited in their savings account, and we have specifically rejected as unworthy of belief Dr. Max's explanation of the source of the funds deposited *245 in the Canadian account.Hence, the source of the bank deposits are effectively unexplained by petitioners. Mere unexplained bank deposits are not sufficient in and of themselves to establish fraud. York v. Commissioner,24 T.C. 742, 743 (1955). However, where, as in this case, substantial amounts of income are consistently omitted from tax returns, and a patently weak explanation is given therefor, a strong inference of fraud attaches. Cf. Gano v. Commissioner,19 B.T.A. 518, 533 (1930). [9]
Further significant evidence of fraudulent intent are Mrs. Max's statements during audit and Dr. Max's testimony at trial, which were proven false by records stipulated into evidence. During the initial audit interview, Mrs. Max denied knowledge of the Canadian account, and at trial, Dr. Max testified that his wife was not aware of the Canadian account. However, it is clear from the bank records that Mrs. Max was well aware of the account prior to audit. She signed contracts of deposit with the Bank of Montreal throughout the years in question, beginning as early as April 1974. Furthermore, *246 she personally made deposits to the account during those years. In addition, as previously explained, the bank records before us contradict Dr. Max's testimony that the money deposited in the Canadian account consisted solely of money brought to him by couriers from Spain. Thus, not only did petitioners fail to cooperate with respondent and the criminal investigative authorities by refusing to reveal until the actual date of trial the identity of the alleged owner of the Canadian funds, but they also, through their false statements, affirmatively attempted to obfuscate the truth about the ownership of those funds. Such attempts to conceal the truth have obvious probative value. Cf. Ehlers v. Vinal,382 F.2d 58, 66 (8th Cir. 1967). [10] In addition to the above indicia of fraud, Dr. Max pled guilty to willfully making and subscribing a false return under section 7206(1) for failing to include in his 1977 return the interest on the Canadian account. Finally, *247 although we believe that fraud is clearly established as to each of the years in question on the basis of the facts already discussed, petitioners' actions with respect to the criminal investigation in this matter may well constitute additional evidence of fraudulent intent. Mrs. Max was indicted on four counts of willfully making and subscribing a false return under section 7206(1). Prior to her indictment, Mrs. Max traveled to Spain, from which she has never returned, even though she remains under indictment. Mrs. Max, of course, did not appear at the trial in the instant case. Her continued absence from the United States under these circumstances hardly aids her cause, amd indeed may reflect upon her intent. [11]
Although Dr. Max denies that he was attempting to flee the country at the time of his arrest, asserting that he was simply going to Spain to finalize the purchase of a medical clinic in association with another doctor, the circumstances surrounding his attempted flight on April 2, 1981 are highly suspicious. It is clear to us that *248 Dr. Max, although not yet served with a subpoena on April 2, 1981, was well aware of the impending indictment through the communications that he had received from his attorney and the office of the United States Attorney. Those communications advised Dr. Max, among other things, that his case was to be presented to the grand jury on April 5, 1981; that he would be required to appear at an arraingnment on or before April 14, 1981; that if he did not appear voluntarily, a warrant would be issued for his arrest; and that he would be required to surrender his passport. In addition, Dr. Max was advised that subpoenas were to be issued and served on his for handwriting exemplars. Even if we were to assume that Dr. Max intended to return to the United States on May 31, 1981, as scheduled, Dr. Max was well aware, or reasonably should have been, that his absence from the United States would have hindered severely the progress of the criminal proceeding. In addition, on the very date of his attempted flight, Dr. Max was contacted by special agent Girard, who scheduled a meeting for 3:00 that afternoon. Dr. Max, of course, failed to appear at the scheduled meeting. Instead, he was busy *249 securing documents for the sale of his condominium, moving furniture to his mother's home, and gathering together various personal possessions, such as deeds, passbooks, withdrawal slips, letters relating to the grand jury investigation, medical supplies, rings, watches, coins, and $44,200 in American currency, to carry with him to Spain. In the face of these circumstances, it is difficult for us to conclude other than that Dr. Max was attempting to avoid the consequences of criminal charges. Such conduct may well give rise to an inference of consciousness of guilt on Dr. Max's part, and therefore may reflect upon his intent. In sum, the cumulative effect of the evidence easily leads us to the inescapable conclusion that respondent has presented clear and convincing evidence that at least some part of the underpayment for each of the years in question was due to fraud with the intent to evade taxes on the part of both petitioners. Respondent's determination that petitioners are liable for the addition to tax under section 6653(b) for each of the years in question is thus sustained. Automobile and Telephone Expenses
Respondent reduced petitioners' deductions for automobile and telephone *250 expenses claimed on their 1974, 1975, and 1976 returns. He disallowed the excess deductions on the basis that petitioners had not shown them to be ordinary and necessary business expenses or paid for the purpose designated on the returns. Petitioners presented no evidence at trial with respect to this issue, nor did they even allude to the issue on brief. An income tax deduction is a matter of legislative grace, and the burden of clearly showing the right to the claimed deduction is on the taxpayer. Interstate Transit Lines v. Commissioner,319 U.S. 590, 593 (1943); New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934). Having presented no evidence to support the deductions claimed on their returns, petitioners have failed to establish their right to any deductions for the expenses in excess of the amounts allowed by respondent. Hence, we sustain respondent's determination disallowing a portion of those deductions. Decision will be entered for the respondent.
Footnotes
1. The parties have stipulated to the foregoing summarization. We note that there are a few minor discrepancies between the numbers stipulated to and those reflected on the deposit slips. These discrepancies do not affect the disposition of this case. In addition, we note that we have been unable to find in the record copies of the deposit slips reflecting the deposits on March 10, 1975, March 15, 1975 March 20, 1975, June 14, 1975, June 24, 1975, and July 1, 1975.↩
2. In the stipulation of facts the total is stated to be $64,020.60. We assume this figure is a mathematical error.↩
3. The parties have stipulated to the foregoing summarization. We note that the Apr. 14, 1975 and Apr. 21, 1975 entries list the same check number. This is an apparent error.↩
4. Section 7206(1) provides, in general, that any person who "[w]illfully makes and subscribes any return, * * * which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter" shall be guilty of a felony.↩
5. Court 4 of the indictment, to which Dr. Max pleaded guilty, charged that Dr. and Mrs. Max-- did wilfully and knowingly make and subscribe a Form 1040 * * *, which was verified by a written declaration that it was made under the penalties of perjury * * *, which said tax form they did not believe to be true and correct as to every material matter; in that the said Form 1040 contained a statement of an adjusted gross income of $86,393.29, whereas, as they then and there well knew and believed, that they received substantial income in addition to that heretofore stated, to wit: approximately $12,931.65 in interest income from a Saving's Account at the Bank of Montreal in Windsor, Ontario, Canada in the name of Dr. Carlos Max and Encarnacion Max; in violation of Section 7206(1) * * *.
6. On brief, petitioners contend for the first time that, in the absence of fraud, the 3-year statute of limitations bars the assessment and collection of any deficiencies for 1974, 1975, 1976, and 1977. In view of our holdings with respect to the deficiency and fraud issues, the exception to the statute of limitations provided in section 6501(c)(1) applies so that the tax may be assessed "at any time." We note, in any event, that petitioners' 1977 return was stamped received on September 22, 1978 and respondent's deficiency notice was mailed to petitioners on May 28, 1981, well within the 3-year period.
7. Petitioners' accountant testified that he was advised by petitioners in 1976 that they had sold their residence. Petitioners' accountant reported that sale on Form 2119 attached to petitioners' 1976 return.According to the Form 2119, the residence was sold on October 29, 1976 at a loss. There is no evidence of whether petitioners received any cash on the sale and, if so, how much.Petitioners have not contended that the source of any of the cash deposits in question was the sales proceeds from this sale.
8. Respondent has not argued that Dr. Max should be estopped, by virtue of his guilty plea to Count 4 of the criminal indictment, from contending that someone other than himself owned the funds in the Canadian account. Had respondent so argued, we might well have found his argument compelling. The language in the indictment is very specific. See n. 5, supra.↩ It could be said that by pleading guilty to Count 4, Dr. Max necessarily admitted ownership of the Canadian funds.
9. Cf. also Shaffrey v. Commissioner,T.C. Memo. 1968-250; Reiben v. Commissioner,T.C. Memo. 1959-91↩.
10. Cf. Moore v. Commissioner, T.C. Memo. 1977-275, affd. by order 619 F.2d 619 (6th Cir. 1980); Sherman v. Commissioner,T.C. Memo. 1977-261; Lutsko v. Commissioner,T.C. Memo. 1969-78; Murray v. Commissioner,T.C. Memo. 1966-231↩.
11. Cf. Sands v. Commissioner,T.C. Memo. 1980-134; Steckler v. Commissioner,T.C. Memo. 1976-244; Mindell v. Commissioner,T.C. Memo. 1955-17↩.